655 P.2d 1004

**James J. WELDON,**
**Contestant-Appellant,**

v.

**Steven K. SANDERS, Contestee-Appellee.**

**No. 13998.**

Supreme Court of New Mexico.

Nov. 9, 1982.
Rehearing Denied Dec. 21, 1982.

Thomas A. Sandenaw, Jr., Las Cruces, for contestant-appellant.

William S. Dixon, Joseph Goldberg, Albuquerque, for contestee-appellee.

OPINION

NEAL, Judge.

This is an election contest brought by James J. Weldon, a write-in candidate for district attorney for the Twelfth Judicial District in the November 1980 general election.

*Procedural History.*

In the 1980 general election write-in campaigns were being conducted for the offices of United States Representative for the Second Congressional District, Santa Fe County Sheriff, and District Attorney for the Twelfth Judicial District. Hoping to streamline the election and avoid confusion, secretary of state Shirley Hooper promulgated Memorandum # 80–50. 80–50 listed the name variations which could be counted for the various write-in candidates, and required the precinct officials to list all of the variations.

After the election the attorney general issued an opinion (80–36) concerning the write-in variations and how they should be counted. The State Canvassing Board then canvassed the results. Applying 80–50 the State Board determined that Weldon lost. Applying 80–36 the State Board determined that Weldon won. The State Board decided

to apply 80–50 because it was issued before the election.

Shortly after the election Weldon petitioned this Court for a writ of mandamus to compel the State Canvassing Board to certify him the winner. He argued that based upon the face of the returns he received the majority of the votes cast. We granted an alternative writ of mandamus compelling the State Canvassing Board to certify Weldon the winner, or to show cause why it should not do so.

Steven K. Sanders, the other candidate for District Attorney in the Twelfth Judicial District, successfully moved to intervene in the mandamus proceeding. He argued that the alternative writ should not be made permanent because Weldon did not receive the majority of the legal votes cast.

At issue in the mandamus proceeding was whether or not the State Canvassing Board had the power to count some write-in votes and not others. Weldon argued that the State Canvassing Board could not accept the county canvasses that were prepared in accordance with 80–50 because the returns indicated that he had received a majority of the votes and should be issued a certificate of election. The county canvassing boards and the State Canvassing Board had no discretion to determine which write-in votes should be counted.

Sanders argued that the State Canvassing Board acted properly in refusing to count all of the write-in votes cast for Weldon. Alternatively, he argued that Weldon failed to demonstrate a clear right to the relief sought.

On December 30, 1980, this Court ordered the alternative writ quashed as improvidently granted. Sanders was certified the winner, and this election contest followed.

The trial court found that the county canvassing boards involved did not comply with statutory requirements and therefore only the precinct returns could properly be considered, and that based upon the precinct returns Sanders received the majority of the votes cast. The trial court rejected Weldon's request to consider the actual write-in scrolls because Weldon never properly applied for a recount. The trial court concluded that Sanders should be declared the winner.

Contestant Weldon raises three issues. Contestee Sanders raises eight issues. Because of our disposition of the case, however, we need not reach all of the issues raised.

We discuss:

1. Whether Weldon may bring an election contest;

2. Whether the District Court correctly disregarded the county canvasses and looked to the precinct returns;

3. The effect of Weldon's failure to apply for a recount; and whether the trial court erred in refusing to look at the write-in scrolls.

1. *Weldon may bring an election contest.*

The Election Code, Sections 1–1–1 through 1–21–14, N.M.S.A. 1978 (Cum. Supp.1982), provides three remedies for candidates who are dissatisfied with election results. One is an election contest, Section 1–14–1, N.M.S.A. 1978.

Section 1–14–1 states:

Any unsuccessful candidate for nomination or election to any public office may contest the election of the candidate to whom a certificate of nomination or a certificate of election has been issued.

This remedy is open to "any unsuccessful candidate".

The Election Code also provides for a recheck, and a recount, Section 1–14–14, N.M.S.A. 1978.

A. Whenever any candidate for any office for which the state canvassing board or county canvassing board issues a certificate of nomination or election believes that any error or fraud has been committed by any precinct board in counting or tallying the emergency paper ballots or absentee ballots, in the verification of the votes cast on the voting machines or in the certifying of the results of any election whereby the results of the elec-

tion in the precinct have not been correctly determined, declared or certified, the candidate, *within six days after completion of the canvass by the proper canvassing board,* may have a recount of the emergency paper ballots or absentee ballots, or a recheck of the votes shown on the voting machines, that were cast in the precinct. (Emphasis added.)

This statute does not require that a candidate be "unsuccessful" before he may apply for a recheck or a recount. He need only believe that error or fraud has been committed. It does require timely application.

Weldon did not apply for a recount within six days after completion of the canvass. Sanders contends that the claims Weldon alleged in his complaint and the relief sought involve a recount only, and that an election contest and a recount are mutually exclusive. Since Weldon did not pursue the correct avenue, a recount, he cannot now bring an election contest. The district court had no jurisdiction to hear Weldon's claims.

■ We reject this argument. Weldon's complaint alleged many errors, and specifically alleged that he received the majority of the votes cast. Under *Seele v. Smith,* 51 N.M. 484, 188 P.2d 337 (1947), this will support an election contest. *Seele* states: "But it is contestant's claimed majority, adversely affected by the conduct of election officials that affords this ground. Section 5, art. 7, Constitution of New Mexico." 51 N.M. at 491, 188 P.2d 337.

The present case comes within this rule. Weldon's complaint alleged that he had received a majority of the votes cast, and that the improper conduct of the election officials in refusing to count certain votes deprived him of victory. Also, a claim involving the validity of certain write-in votes was sufficient to support an election contest in *Turner v. Judah,* 59 N.M. 470, 286 P.2d 317 (1955).

Sanders' argument relies heavily on the fact that an election contest is a completely separate remedy from a recount. This is true. An examination of the election contest statute, Section 1–14–1, *supra,* and the

recount and recheck statutes, Section 1–14–14 and Section 1–1–6, N.M.S.A. 1978 indicates that the election contest is a much broader remedy.

■ Arguing that a recount and an election contest are completely separate Sanders leaps to the conclusion, unsupported by any authority, that they are mutually exclusive. This is not expressed anywhere in the Election Code. To adopt Sanders' argument we would have to write words into the Election Code, which we will not do.

2. *The trial court correctly disregarded the county canvasses.*

■ The trial court found that the county canvasses were conducted in violation of the Election Code. First, the county canvassing boards canvassed directly from the write-in scrolls instead of from the precinct returns as required by Section 1–13–4, N.M.S.A. 1978. Second, the county canvassing boards corrected purported errors or omissions in the precinct returns without notifying the precinct officials, Section 1–13–5, N.M.S.A. 1978, or the secretary of state, Section 1–13–6, N.M.S.A. 1978.

Because the county canvasses were conducted in contravention of the Election Code the trial court refused to consider them. The court concluded that it could properly look only to the precinct returns.

The Twelfth Judicial District is comprised of Lincoln and Otero counties. The Otero County canvass totalled 235 more votes for Weldon than the precinct returns, enough to give him a majority. The conclusion that the county canvasses should not be considered was crucial.

Weldon's position is that the election officials followed the procedure set forth in the secretary of state's Memorandum # 80–50, and was proper. Alternatively, he argues that any errors were "irregularities" which would not void an election, citing *Carabajal v. Lucero,* 22 N.M. 30, 158 P. 1088 (1915) and its progeny.

Section 1–13–4, *supra,* states:

The county canvassing board *shall* canvass the *election returns* by carefully examining *such returns of each precinct* to ascertain if they contain the properly executed certificates required by the Election Code [this chapter] and to ascertain whether any discrepancy, omission or error appears on the face of the election returns.

The word "shall", as used in the Election Code, is mandatory. § 1–1–3, N.M.S.A. 1978.

"Election returns" is defined in Section 1–1–8, N.M.S.A.1978:

"[E]lection returns" means the certificate of the precinct board showing the total number of votes cast for each candidate, or for or against each proposed constitutional amendment or other question, and may include statements of canvass, signature rosters, pollbooks, tally books, machine printed returns and, in any canvass of returns for county candidate, the original affidavits of registration in the possession of the county clerk, together with the duplicate affidavits of registration in the office of the county clerk.

The actual ballots are not part of the "election returns" under this definition.

Section 1–13–5, *supra,* states:

A. The county canvassing board *shall* immediately issue a summons directed to the precinct board, *commanding them [precinct board] to forthwith appear and make the necessary corrections or supply omissions if:*

(1) it appears on the face of the *election returns* that any certificate has not been properly executed;

(2) it appears that there is a discrepancy within the *election returns;*

(3) it appears that there is a discrepancy between the number of votes set forth in the certificate for any candidate and the number of electors voting as shown by the *election returns;* or

(4) it appears that there is any omission, informality, ambiguity, error or uncertainty *on the face of the returns.* (Emphasis added.)

If error is found and a summons is directed to the precinct board, the secretary of state "shall" be notified. § 1–13–6, *supra.*

Section 1–13–5(A) and Section 1–13–4 explicitly state that the county canvassing board is limited to examining only the "election returns". This does not include the actual ballots. § 1–1–8, *supra.* A reading of Section 1–13–4 and Section 1–13–5(A) also indicates that the duty of the county canvassing board is limited to finding errors, not correcting them. If error is found the precinct board shall be notified. In such a case the secretary of state must also be notified. § 1–13–6.

In the present case there are three violations of Election Code provisions which the Legislature has deemed mandatory. In canvassing directly from the actual write-in ballots (the write-in scrolls) Section 1–13–4 was violated. In canvassing from the actual ballots and, finding error, correcting them without notifying the precinct board the county canvassing board violated Section 1–13–5. Furthermore, Section 1–13–6 was violated when the secretary of state was not notified.

 Weldon contends that the county canvassing board was following the instructions promulgated by the secretary of state in Memorandum # 80–50. Does the secretary of state have the power to change mandatory provisions of the Election Code? The answer is "no".

The trial court concluded as a matter of law that Memorandum # 80–50 was an invalid exercise of legislative power. We agree.

The secretary of state is in the executive department. N.M. Const., Art. V, § 1. The power to enact legislation is vested in the Legislature, N.M. Const. Art. IV, § 1, and this includes the power to enact statutes covering elections. Although the secretary of state is the chief election officer, Section 1–2–1, N.M.S.A. 1978 (Cum.Supp.1982), she cannot negate mandatory provisions of the Election Code. To allow the secretary of state to do so would violate the doctrine of separation of powers.

The duties of the secretary of state, as chief election officer, are limited. Section 1–2–1, *supra,* states that subject to the State Rules Act, the secretary may make rules and regulations "pursuant to the provisions of" the Election Code. The State Rules Act [14–3–24, 14–3–25, 14–4–1 to 14–4–9, NMSA 1978] requires that, to be valid, the rule must be filed in the records center. § 14–4–3 and § 14–4–5. The trial court found that Memorandum # 80–50 was never filed in the records center and was void. Also, Section 1–2–2(C), *supra,* states that the secretary of state shall "prepare instructions for the conduct of election and registration matters *in accordance with the laws of the state*". (Emphasis added.) Memorandum # 80–50 is not in accordance with the laws of the state.

The secretary of state acted beyond the scope of her duties, defined by the Constitution and the Election Code, in promulgating Memorandum # 80–50. It had no effect. Weldon cannot argue that the election officials acted properly in following it.

It should be noted that determining which variations of write-in votes should be counted has been addressed by the Legislature. Section 1–12–19.1, N.M.S.A. 1978 (Cum.Supp.1982). This section, however, does not apply to the present case.

■ Weldon's argument that the violations of the Election Code are "irregularities" is also without merit. He cites the general rule that irregularities will not void an election, citing *Carabajal, supra; Gallegos v. Miera,* 28 N.M. 565, 215 P. 968 (1923); *Bryan v. Barnett,* 35 N.M. 207, 292 P. 611 (1930); *Orchard v. Board of Com'rs of Sierra County,* 42 N.M. 172, 76 P.2d 41 (1938); and *Reese v. Dempsey,* 48 N.M. 485, 153 P.2d 127 (1944).

The rule expressed in these cases does not apply here. First, all of them except *Reese, supra,* deal with Election Code provisions which were deemed directory only. *Reese* is different on its facts. There the Supreme Court declined to throw out the results of entire precincts because of alleged error. Here we are not faced with wholesale disenfranchisement of voters. Second,

we are not concerned here with voiding an election. We are concerned with whether the trial court should have considered the county canvasses or the precinct returns.

We cannot call the violations of the Election Code present here "irregularities". They were more than that. The county canvassing board is required to consider only certain materials, the election returns, in making its canvass. If it finds error it must summon the precinct board to correct any error, and the secretary of state must also be notified. It is the job of the county canvassing board to *find* errors. It is not the job of the county canvassing board to *correct* errors. · In setting up this structure in the Election Code the Legislature has defined the duties of and relationship between the precinct boards and the county canvassing boards. In using the word "shall" in the statutes defining their respective duties (§ 1–13–4 and § 1–13–5) the Legislature has made these statutes mandatory. § 1–1–3. We will not, by judicial fiat, redefine the duty of the county canvassing boards. The violations here are too important to be dismissed as "irregularities".

■ We hold that mandatory provisions of the Election Code were violated. What is the effect of this?

The trial court concluded that it would not consider the county canvasses because they were conducted in contravention of the Election Code. The trial court then correctly proceeded to consider the precinct returns.

*Seele v. Smith, supra,* is dispositive of this issue. *Seele* held that county canvasses conducted in violation of mandatory provision of the Election Code are nullities.

In *Seele* the precinct officials counted the votes. A recount was made, without statutory authorization, and it was held that the recount could not be considered. The original count, properly made under the law, was considered.

Under *Seele* the trial court was correct in disregarding the county canvasses and rely-

ing on the precinct returns. The canvasses made by the county canvassing boards were unauthorized under the Election Code and should not be considered.

3. *The effect of Weldon's failure to apply for a recount.*

Section 1–14–14(A), *supra,* states that a candidate seeking a recount should apply within six days after completion of the canvass by the proper canvassing board. Weldon failed to do this.

Under this point we deal with two points raised by Weldon. One, that the recount provision does not apply to write-in votes, and two, that the trial court erred in refusing to examine the actual write-in scrolls.

The trial court concluded that it should not consider the actual write-in scrolls because to do so would be a ballot recount, which was never properly applied for.

A. Section 1–14–14 applies to write-in votes.

■ Section 1–14–14 deals with recounts and rechecks. The two remedies are different. Section 1–1–6, *supra,* defines "recount":

B. "recount" pertains to emergency paper ballots and absentee ballots and means a retabulation and retallying of individual ballots.

A "recount" concerns emergency paper ballots and absentee ballots only. Section 1–14–14 states that if timely application is made, the candidate may have a recount of the "emergency paper ballots or absentee ballots." Write-in votes are cast on a paper scroll which is part of the voting machine. Write-in votes are not "emergency paper ballots", as defined in § 1–12–43, N.M.S.A. 1978, nor are they "absentee ballots". Although the parties in this case have steadfastly characterized examination of the actual write-in scrolls as a recount, this is incorrect. Under § 1–1–6 and § 1–14–14, *supra,* a "recount" does not involve examination of the write-in scrolls.

Section 1–14–14 also provides for a "recheck". Section 1–1–6 defines "recheck":

A. "recheck" pertains to voting machines and means a verification procedure where the center counter compartment door of the voting machine is opened and the results of the balloting as shown on the counters of the machine are compared with the results shown on the official returns.

Is this definition broad enough to include examination of the write-in scrolls? Section 1–14–14 considered with Section 1–1–6 indicates that "recheck" is broad enough to include examination of write-in scrolls. Section 1–14–14 provides that:

[A]ny candidate * * * [who] believes that any error or fraud has been committed * * * in the verification of the votes cast on the voting machines or in the certifying of the results of any election whereby the results of the election in the precinct have not been correctly determined, declared or certified * * * within six days after completion of the canvass by the proper canvassing board, may have * * * a *recheck of the votes shown on the voting machines,* that were cast in the precinct. (Emphasis added.)

Write-in votes are "cast on the voting machines" and "shown on the voting machines". They come within the ambit of Section 1–14–14, which allows a "recheck of the votes shown on the voting machines" when a candidate claims "any error * * * in the certifying of the results". We conclude that examination of the write-in scrolls concerns "recheck", and is covered by Section 1–14–14.

B. The trial court correctly refused to examine the write-in scrolls.

■ Weldon did not apply for a recount or a recheck within six days. § 1–14–14, *supra.* Under *Seele* this precludes an examination of the write-in scrolls.

In *Seele,* an election contest, the contestant argued that the actual ballots were available and that the court had inherent power to make a recount. This argument was rejected:

Contestee further contends that all ballots are yet available and that the court had inherent power to make a recount. Procedure for a recount was unknown to the common law; hence we must look to the statute, if any, for such authority. We know of no authority and none has been cited where, under the circumstances shown, the court possesses such power. The burden, by statute, is upon the party asserting this right. Contestant did not seek a recount and it was not incumbent upon him to assume this burden. 29 C.J.S., Elections, §§ 298, 291(a) and (b), 295.

Under the *Seele* rule, the actual ballots (the write-in scrolls) cannot be examined because, as in *Seele,* the contestant failed to apply for a recount.

We note that *Seele* characterized examination of the ballots as a recount. We have characterized examination of the ballots, the write-in scrolls, as a recheck. This is because of the 1977 amendment to Section 1–14–14 which added "rechecks" to the statute, and narrowed the scope of "recounts". This does not alter our conclusion that the write-in scrolls cannot be examined.

Weldon distinguishes *Seele* because it involved conduct of election officials which violated a mandatory provision of the Election Code. This case, he argues, involves not the violation of the Election Code, but the validity of write-in votes. This distinction is without merit. In *Seele* the violation of the Election Code went only to whether or not the count made in contravention of the Election Code should be counted. It did not affect the court's refusal to allow a recount of the actual ballots. The rule announced was clear: Contestant could not have a recount because he did not request one.

Weldon also argues that "[t]he court below, and this Court on appeal, can correct any error of law appearing on the face of the ballot," citing *Turner, supra.* The question is not whether we can correct errors on the face of the ballot, but whether we can look at the ballots. Weldon has cited us to cases in which the actual ballots were examined. *Madrid v. Sandoval,* 36 N.M. 274, 13 P.2d 877 (1932); *Telles v. Carter,* 57 N.M. 704, 262 P.2d 985 (1953); and *Romenesko v. Barber,* 79 N.M. 83, 439 P.2d 919 (1968). These cases, however, concern changed or mutilated ballots (*Madrid*), whether the ballots were marked properly (*Telles*), and spoiled ballots (*Romenesko*). Under those circumstances it would be necessary to examine the actual ballots.

■ Finally, Weldon argues that the write-in scrolls should have been examined because of the "best evidence rule", N.M.R. Evid. 1002, N.M.S.A.1978. He argues that the write-in scrolls were the best evidence of the actual vote.

Evidence Rule 1002 states:

> To prove the content of a writing, recording or photograph, the original writing, recording or photograph is required, except as otherwise provided in these rules or by statute.

This rule comes into play only when it is necessary to prove the content of the original, in this case, the write-in scrolls. As previously discussed, because of Weldon's failure to comply with Section 1–14–14, *supra,* the content of the write-in scrolls was not in issue.

We have considered the arguments raised by the contestant Weldon and find them to be without merit. It is unnecessary to address other issues raised by the contestee Sanders.

The judgment of the trial court is affirmed.

IT IS SO ORDERED.

PAYNE, C.J., and FEDERICI, J., concur.